UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:21-cv-02326-SB-KES | Date: | April 20, 2022 |
|---|---|---|---|

| Title: | *Sheilanee Sen et al. v. City of Los Angeles et al.* |
|---|---|

Present: The Honorable   **STANLEY BLUMENFELD, JR., U.S. District Judge**

| Jennifer Graciano | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   **[In Chambers] ORDER RE: MOTIONS FOR SUMMARY JUDGMENT [Dkt. No. 96]**

Plaintiffs Sheilanee Sen and Shibani Balsaver bring this civil rights action arising out of a "high-risk" stop conducted by Los Angeles Police Department (LAPD) officers on the mistaken belief that the U-Haul truck Balsaver had rented was stolen.  Both Plaintiffs and Defendants City of Los Angeles, Officer John Jianu, Officer Jonathon Jarvis, Officer Chris Choi, Sergeant William Cooper, Sergeant Jeannette Pelayo, and Chief Michael Moore move for summary judgment.  Dkt. No. 96.  The parties also filed supplemental briefs on their respective motions.  Dkt. Nos. 102 (Defendants' Supp.), 109 (Plaintiffs' Supp.).  For the reasons stated below, the parties' motions are **granted** in part and **denied** in part.

## BACKGROUND

On February 8, 2020, Balsaver rented a U-Haul truck with Arizona license plate AE88322 to move from her apartment in Hollywood to her new apartment

just over a half-mile away.  Joint Appendix of Facts (JAF) 70–71, Dkt. No. 96-2.[1]
She parked it outside of her old apartment on Franklin Avenue around 11:30 a.m.
JAF 70, 73.  At approximately 1:00 p.m., LAPD Officers Jarvis and Jianu were on
patrol in Hollywood and observed Balsaver's U-Haul parked on Franklin Avenue.
JAF 1.  Officer Jarvis, who was in the passenger seat, entered the U-Haul's license
plate into the Stolen Vehicle System (SVS) on the patrol car's Mobile Data
Computer (MDC).  JAF 3.  Officer Jarvis typically queried license plates on U-
Hauls as a matter of course because in his experience they were often used in the
commission of burglaries in the Hollywood area.  Joint Appendix of Evidence
(JAE) Ex. X (Jarvis Dep.), at 116:20–117:25, Dkt. No. 96-19.

    The SVS returned the following information at 1:01 p.m.:

QV.CA0194200.LIC/AE88322

NO HITS IN SVS

NEAR MISS IN SVS ON AE88322

AE88322    AZ STOLEN VEH    GMC

FCN/2742001701510    CV

********END OF SVS MESSAGE********

JAF 4.  Based on the fourth line of the message, Officers Jarvis and Jianu believed
the vehicle was stolen.  JAF 5.  The "CV" code on the fifth line, however, was an
abbreviation for "cleared vehicle" and meant the vehicle had since been recovered
and was no longer stolen.  JAF 44.  But the officers were not familiar with this
code.  JAF 45.  For the next 25 minutes, they remained on Franklin Avenue to
observe the U-Haul but took no additional steps to verify the information from the
SVS or seek clarification on the "CV" code.  JAF 89, 341.

    After loading the U-Haul, Balsaver drove it (with Sen in the passenger seat)
to her new apartment on Garfield Avenue.  JAF 90, 92.  Officers Jarvis and Jianu
immediately began following the U-Haul; Officer Jarvis ran the license plate
through the SVS for a second time at 1:27 p.m., and the MDC returned the same
information, which Officers Jarvis and Jianu believed meant the vehicle was

---

[1] Both Plaintiffs and Defendants submitted evidentiary objections along with their
Joint Brief.  Dkt. No. 96-3.  To the extent that the Court relies on evidence that is
subject to an objection, the objection is overruled.  *See Godinez v. Alta-Dena
Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3
(C.D. Cal. Jan. 29, 2016).  The objections are otherwise overruled as moot.

stolen.  JAF 93–95.  Officer Jarvis then initiated a "high-risk" stop, also known as a "felony stop," for a suspected stolen vehicle.  JAF 98.  As part of procedure for a high-risk stop, he radioed to dispatch that he was following a stolen vehicle, gave his location, and requested backup, a helicopter, and a supervisor.  JAF 19, 98.  Officers Jarvis and Jianu continued to follow the vehicle as it turned onto Garfield Avenue, continued down the street for a short distance, and then pulled over to the right side of the road on its own at 1:29 p.m. JAF 102–103.  Officers Jarvis and Jianu pulled over behind the U-Haul and activated the lights on their patrol vehicle.  JAF 107–108.

Plaintiffs' encounter with the officers is captured on dashboard camera footage from several patrol vehicles, the body-worn cameras (BWCs) of Officers Jarvis, Jianu, and Choi and Sergeants Cooper and Pelayo, and a bystander video.  JAF 18; JAE Exs. B–E, H–U, AAA, QQQQ.  While not a perfect depiction of the incident, the recordings capture the vast majority of relevant events during the encounter.  Thus, the Court does not adopt any facts asserted by either party to the extent they contradict the video recordings.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (noting that courts should not adopt a version of the facts on summary judgment if contradicted by video footage).

A total of sixteen officers—including Sergeant Cooper (then an Officer), Officer Choi, and Sergeant Pelayo—and an LAPD helicopter responded to the incident and arrived on scene shortly after the U-Haul pulled over.  JAF 26, 109–110.  Multiple officers drew their weapons and held them pointed downwards, or in the "low-ready" position, in the direction of the U-Haul.[2]  Plaintiffs were ordered to drop the keys out of the driver's side window, which Balsaver did.  Balsaver was ordered out of the vehicle; she was instructed to place her hands on her head, move away from the U-Haul, and lie face down on the ground spread-eagled, with her hands and feet spread apart (otherwise known as the prone position).  Sen was then ordered out of the vehicle; she was instructed to open the

---

[2] Plaintiffs dispute that the officers held their weapons in the low-ready position throughout the encounter and argue that the officers pointed their weapons at Plaintiffs while ordering them out of the truck and approaching them on the ground.  *See* JAF 33, 111, 112, 115, 119, 122, 124, 126, 129.  The video recordings, however, do not support Plaintiffs' version of the facts—at each moment Plaintiffs claim weapons were pointed at them, the footage depicts those weapons pointed in Plaintiffs' direction—or in the direction of the U-Haul—but towards the ground.

storage door at the back of the U-Haul and directed to walk towards Balsaver and get into the same prone position on the ground.  Officer Jarvis then briefly stepped into the U-Haul's storage compartment.  He conducted a 15-second sweep, shifting some of Balsaver's belongings, to ensure the vehicle was "clear" and no one was hiding in the storage compartment.

Seven officers, five of whom had their weapons drawn and held in the low-ready position, approached Sen and Balsaver where they were lying on the ground. Sergeant Cooper placed his left knee on Sen's back, handcuffed her, pulled her to a sitting position, and directed her to stand up while holding her by her arms.  Sen repeatedly asked the officers "what's going on" and cried out that they "didn't do anything."  Officer Jianu then approached Balsaver and placed his left knee on her back; his right knee was over her neck but it is unclear how much weight he placed on her neck.  Officer Jianu handcuffed Balsaver, pulled her onto her side, and instructed her to stand up while holding her by her arms.  While Sen and Balsaver were handcuffed, Officer Choi stood nearby holding a less-than-lethal beanbag gun in the low-ready position with his finger off the trigger.  JAF 33.  In total, Sen was on the ground for one minute and 48 seconds, and Balsaver was on the ground for three minutes and 41 seconds.  JAF 35–36.

Plaintiffs were then each given a brief pat-down by a female officer.  JAF 37.  They told the officers where their identification was located and that they had rented the U-Haul earlier that day, and Balsaver told the officers that the rental paperwork was located in the vehicle.  JAF 41–42.  Sen was then placed in the back of a patrol car while the officers investigated.  JAF 43.  Balsaver remained in handcuffs on the street next to a patrol car.  The officers appeared to quickly suspect that the vehicle was not stolen; they found the rental paperwork in the front of the vehicle that confirmed Balsaver had rented it earlier that day, and one of the officers noted while looking in the back of the U-Haul that "it's not like the last one, those guys were burglars you could just tell."  But it took them some time to confirm that the vehicle was not stolen.  They called U-Haul and reached someone who appeared to confirm that the vehicle had been rented but could not confirm whether it was stolen.  Officer Jarvis then called the LAPD vehicle information processing unit (VIPU), and they informed him that the vehicle had previously been stolen but was subsequently recovered, as indicated by the "CV" code in the SVS message.  JAF 44.  Indeed, it was Officers Jarvis and Jianu who had recovered the U-Haul 19 days earlier.  JAF 263.

At 1:57 p.m., Sergeant Pelayo approached Balsaver and explained that they were "confirming with the supervisor from the vehicle recovery," but the SVS

system showed that the vehicle was stolen even though it had since been recovered.  For the next several minutes, while Balsaver remained handcuffed, Sergeant Pelayo explained that the officers had conducted a high-risk stop pursuant to "policy and procedure" for a stolen vehicle.  At 2:01 p.m., officers escorted Sen out of the vehicle and over to join Balsaver and then removed both Plaintiffs' handcuffs.  Marks from the handcuffs remained on Sen's wrists for two days.  JAE Ex. OO, at 116:25–117:3.  The officers then stayed with Plaintiffs while they unloaded the vehicle and escorted them to return it.  Several days later, on February 14, 2020, Plaintiffs came to the Hollywood station and met with Segreant Pelayo, who again explained why the officers believed the vehicle was stolen.  JAF 67.

* * *

Plaintiffs filed this lawsuit in March 2021.  They allege claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, and failure to intervene; they also bring a claim under the Bane Act, Cal. Civ. Code § 52.1, and common-law claims of assault, battery by a peace officer, intentional infliction of emotional distress, and negligence.  Defendants move for summary judgment on Plaintiffs' § 1983 and Bane Act claims.[3]  Plaintiffs also move for partial summary judgment on their § 1983 claims and their negligence claim.

## LEGAL STANDARD

Summary judgment is appropriate where the record, read in the light most favorable to the nonmoving party, shows that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" based on the issue. *Id*.  In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at

---

[3] Plaintiffs agree to dismiss their § 1983 and Bane Act claims against Chief Moore. Joint Brief at 9 n.3.  Plaintiffs are further **ordered** to meet and confer with Defendants regarding the viability of their common-law claims against Chief Moore.

255.  But if the evidence of the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249–50.

The burden is first on the moving party to show an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party satisfies this burden either by showing an absence of evidence to support the nonmoving party's case when the nonmoving party bears the burden of proof at trial, or by introducing enough evidence that would entitle the moving party to a directed verdict when the moving party bears the burden of proof at trial.  *See id*. at 325; *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  If the moving party satisfies this initial requirement, the burden then shifts to the nonmoving party to designate specific facts, supported by evidence, showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  If the nonmovant "fails to properly address another party's assertions of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion [or] . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## DISCUSSION

### A.   Section 1983 Claims

Plaintiffs allege four violations of the Fourth Amendment under § 1983: (1) unreasonable seizure of Sen and Balsaver, (2) unreasonable search of Balsaver's U-Haul, (3) excessive force used against Sen and Balsaver, and (4) failure to intervene in these allegedly unlawful actions.  Defendants move for summary judgment on all four § 1983 claims, arguing that officers did not violate Plaintiffs' rights or are otherwise entitled to qualified immunity.  Plaintiffs also move for summary judgment on an alternative basis for their unreasonable seizure claim:  whether the officers unreasonably prolonged their detention.

Even if an officer's actions violate the U.S. Constitution, he or she may still be entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'"  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The purpose of qualified immunity is to provide officers "'breathing room to make reasonable but mistaken judgments,'

and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  The availability of qualified immunity depends on:  (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).  It is within the sound discretion of the district court to determine which of the two prongs should be addressed first. *Pearson*, 555 U.S. at 236.

As the Supreme Court has recently emphasized, "courts [are] not to define clearly established law at too high a level of generality." *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam).  "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. (cleaned up).  "[I]n an obvious case," the rule "can clearly establish the answer, even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (cleaned up); *Hardwick v. County of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017) (noting that sometimes conduct is "so clearly and obviously wrong that the conduct itself unmistakably 'should have provided [defendants] with some notice' that their alleged conduct violated their targets' constitutional rights" (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002))).  But in a situation that is "not . . . obvious," Plaintiffs "must identify a case that put [an officer] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.

## 1.    Unreasonable Seizure

Plaintiffs claim that Defendants unreasonably seized them in violation of their Fourth Amendment rights.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (detaining a vehicle is considered a seizure under the Fourth Amendment).

### a.    Reasonable Suspicion

To justify a seizure, an officer must have at least a reasonable suspicion of criminal activity based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  An officer "may rely on the totality of facts available to them in establishing probably cause," but he also "may not disregard facts

tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

Defendants do not dispute that the officers mistakenly believed the U-Haul was stolen based on the MDC return, but they argue that the fourth line of the message indicated that the U-Haul's license plate was an exact match to a stolen vehicle. Joint Brief at 19. But the fourth line of the message did not appear in isolation; the total message contained information showing the vehicle was not currently stolen. The second line stated that there were "no hits in SVS," which meant the record was not active in the system—i.e., it was not currently listed as stolen. Indeed, if the record on this vehicle was active in the SVS, the officers would have received a full report when Officer Jarvis entered the plate number, instead of the brief, five-line message. JAE Ex. LL (Escoto Dep.), at 67:3–25. Thus, the abbreviated return was itself an indicator that the vehicle was not stolen. *Id*. (agreeing that "any officer familiar with the SVS system who sees a return like this should know that this vehicle is not currently stolen"). The third line further stated that the license plate was a "near miss" in the SVS, rather than an actual hit on a stolen vehicle. *Id*. at 65:15–24 (noting that an officer should query the full record for a vehicle if he or she receives a "near miss" response); *see also* JAF 275 (officers are trained not to act based solely on a "near miss" response).

Officers Jarvis and Jianu testified that they had recently received a few similar MDC returns that included "no hits in SVS," "near miss in SVS," and "stolen," and found them to be "odd" or perhaps a "glitch." Jarvis Dep. at 144:2–9, 146:14–15; *see also* Jianu Dep. at 44:18–45:8 (agreeing that similar results previously received were "strange" and "inconsistent"). The previous times the officers had seen a similar MDC return—including an incident less than three weeks earlier, when they recovered the exact same U-Haul—the vehicle turned out to be stolen. Based on those experiences, the officers thought that the vehicle in this case was also stolen. Jarvis Dep. at 179:1–5. But the fifth line of this message contained crucial information that had not appeared in the prior returns: the "cleared vehicle" (CV) code, which meant the vehicle had been recovered and was no longer stolen. *Id*. at 160:21–161:4; Escoto Dep. at 39:3–11. The officers did not know the meaning of this code and had not seen an MDC return like this before. JAF 45, 317.

In short, the officers' sole basis for their suspicion that the vehicle had been stolen was the SVS message that they claim was similar to one they had previously received and found confusing but had led them to recover stolen vehicles—including this exact vehicle three weeks prior. But this SVS message contained a

significant code not found in the prior messages—a "CV" code on the fifth line indicating the vehicle had been recovered after having been stolen.  The officers were not familiar with this code and did not seek to clarify its meaning either by seeking the full SVS report or contacting dispatch or the VIPU.  Moreover, the officers were trained to verify the MDC return for accuracy before taking any action if they have time to do so.  JAF 286, 294.  The officers had 25 minutes to verify the message or seek clarification about the meaning of the "CV" code, yet they did not do so.  JAF 341.  On this record, Defendants are not entitled to summary judgment on the issue of whether they had reasonable suspicion to initiate a stop of Plaintiffs' vehicle based on the message they received from SVS.

   b. <u>Qualified Immunity</u>

 *Officers Jarvis and Jianu*.  Officers Jarvis and Jianu are not entitled to qualified immunity because their mistake was unreasonable and the law clearly established that they could not conduct a stop without reasonable suspicion.

 The first prong of the qualified immunity doctrine (the constitutional violation) "concerns the reasonableness of the officer's mistake of fact."  *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011) (emphasis omitted); *see also United States v. Twilley*, 222 F.3d 1092, 1096 n.1 (9th Cir. 2000) (reasonable suspicion for a traffic stop may be formed based on an officer's mistake of fact, so long as the belief was "held reasonably and in good faith").  Thus, the issue is "whether a reasonable officer would have or *should* have accurately perceived th[e] fact" in light of the circumstances confronted.  *Torres*, 648 F.3d at 1124; *cf. Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) (holding that it was unreasonable for an officer to mistakenly believe a car's windows were illegally tinted when they were rolled down, thus the officer could not see them).

 As discussed, Officers Jarvis and Jianu initiated a high-risk stop based on nothing more than a short MDC return that contained a recovered-vehicle code with which they were unfamiliar.  There were no other indicia—such as Plaintiffs' behavior while loading the U-Haul or its contents—that could have reasonably, but mistakenly, led them to believe that the vehicle was stolen.  *Cf. Monica v. Williams*, 807 F. App'x 682 (9th Cir. 2020) (finding that an officer's mistaken belief about the placement of a license plate was reasonable because "(1) the incident occurred at night, (2) the front bumper was missing, and (3) [the decedent] admitted that . . . the [license] plate was attached to the car's body in a way that could make it difficult to see at night").  Further, the officers are trained to verify the accuracy of an MDC return before initiating a stop if time permits, yet they

took no steps to do so despite having ample time (i.e., 25 minutes) to inquire while they sat observing the vehicle parked on Franklin Avenue. *See Green v. City of San Francisco*, 751 F.3d 1039, 1046 (9th Cir. 2014) (reversing grant of summary judgment because officer did not follow police policy and verify an "unconfirmed hit" on a stolen vehicle despite the fact that he "had several opportunities to confirm the license plate number with dispatch and even spent time stopped behind [the plaintiff] at a red light"). In these circumstances, where Officers Jarvis and Jianu relied entirely on an MDC return that they knew they did not understand, where the officers had time to learn about the meaning of the unknown information but did not do so, and where their training would have required them to take further action before stopping the vehicle, Defendants have not demonstrated that the officers' mistake was reasonable such that Officers Jarvis and Jianu would be entitled to qualified immunity.

The second prong (clearly established law) "concerns the reasonableness of the officer's mistake of law." *Torres*, 648 F.3d at 1127 (emphasis omitted). When analyzing the second prong, courts assume the officer "'correctly perceived all of the relevant facts' and ask whether an officer could have reasonably believed at the time" that his conduct "was lawful under the circumstances." *Id*. Thus, the question is whether a reasonable officer, aware that the vehicle was not stolen, would clearly know he could not lawfully conduct a stop. *See id*. at 1129 (assuming the officer knew she fired a firearm rather than a taser). The answer is yes, and Officers Jarvis and Jianu do not contend otherwise. The only reason for the stop was their mistaken reading of the MDC return, which actually stated that the vehicle had been "cleared" and was no longer stolen. Had they officers read the MDC return correctly, they would have had no basis to suspect criminality.

Neither party has presented a factually similar case where an officer misread an MDC return and mistakenly believed a vehicle was stolen, but this is the kind of "obvious case" that does not require a body of case law to establish the unlawfulness of the officers' conduct. *Rivas-Villegas*, 142 S. Ct. at 8; *see also Est. of Aguirre v. County of Riverside*, 29 F.4th 624 (9th Cir. 2022) (concluding that "[t]his is one of those obvious cases" involving the basic constitutional principle that an officer may not use deadly force in the absence of an immediate threat). "[I]t has long been clearly established that it is unlawful to conduct an investigatory stop and search unsupported by reasonable suspicion." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1237 (9th Cir. 2016). Here, the suspicion was the product of a readily avoidable mistake that merely called upon the officers to use their training, or at least recognize that they should inquire if they did not understand the meaning of what they were reading, before engaging in a high-risk

stop.  Accordingly, Officers Jarvis and Jianu are not entitled to qualified immunity as a matter of law.

   *Sergeants Pelayo and Cooper and Officer Choi*.  Sergeants Pelayo and Cooper and Officer Choi are entitled to qualified immunity on Plaintiffs' unreasonable seizure claim.  Even if Officers Jarvis and Jianu were mistaken in believing there was reasonable suspicion for the stop, all the officers who responded to the call for a high-risk stop acted on "[a] facially valid direction from one officer to another to stop a person or a vehicle," which "insulates . . . complying officer[s] from assuming personal responsibility or liability" for acts done "in obedience to the direction."  *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976).

   Plaintiffs argue that a jury could impose liability on the officers for failing to inquire further into a dispatch call about a "possible" stolen vehicle.  Joint Brief at 16–17.  But "[t]he lynchpin" of this duty "is whether the officer's reliance on the information was objectively reasonable."  *Motley v. Parks*, 432 F.3d 1072, 1082 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012).  The officers received a call from dispatch to respond as backup for a high-risk stop on a potentially stolen vehicle; they raced to the scene in mere minutes, followed training and procedure, and investigated whether the vehicle was stolen before releasing Plaintiffs.  Under these circumstances, the officers' reliance on the information from dispatch was objectively reasonable.

   Plaintiffs also argue that the officers are not entitled to qualified immunity because a jury could find that all of the officers—including Sergeants Pelayo and Cooper and Officer Choi—engaged in a high-risk stop based solely on suspicion of a stolen vehicle, which may have elevated the stop to an arrest without probable cause.  *See Green*, 751 F.3d at 1047–49.  However, even if these high-risk tactics did amount to a de facto arrest, the officers would nonetheless be entitled to qualified immunity because there is no case law that "clearly establishes that a high-risk stop is an unreasonable level of intrusiveness for a suspected stolen vehicle."  *Theney v. City of Los Angeles*, No. CV 15-9602-AB (AFMx), 2017 WL 10743001, at *9 (C.D. Cal. June 19, 2017) (granting qualified immunity to officers who responded as backup for a high-risk stop).

         c.    Prolonged Detention

   Plaintiffs move for summary judgment on their unreasonable seizure claim based solely on a theory of a prolonged detention.  That is, Plaintiffs argue that

even if the officers had reasonable suspicion, they unreasonably prolonged the detention by "at least 9 minutes, and as many as 25 minutes" because the suspicion had—or, through the exercise of diligence, should have—diminished sooner. Plaintiffs' Supp. at 5 (citing *Rodriguez v. United States*, 575 U.S. 348, 350 (2015)).

    As an initial matter, Plaintiffs rely on an erroneous interpretation of *Rodriguez*, in which the Supreme Court held that a stop may violate the Fourth Amendment if it exceeds "the time needed to handle the matter for which the stop was made." 575 U.S. at 350; *see also Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) ("[D]etention beyond the duration of the initial traffic stop must be supported independently by reasonable suspicion of criminality."). In that case, the officer detained Rodriguez for an additional seven to eight minutes after issuing a written warning for the traffic violation, which was the sole basis for the stop. Although the officer had completed his investigation of the traffic stop, he continued to detain Rodriguez while a second officer arrived to conduct a dog sniff of the vehicle. *Rodriguez*, 575 U.S. at 352 (citation omitted). The trial court determined that there was no reasonable suspicion to support Rodriguez's detention once the warning was issued, but that the additional time was "only a de minimis intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible." *Id*. The Supreme Court disagreed, noting that the dog sniff was "not an ordinary incident of a traffic stop" and thus could not be justified by even a de minimis intrusion. *Id*. at 354–57. Plaintiffs argue that their facts "are even stronger than in *Rodriguez*" because they were detained for an additional 9 to 25 minutes after the officers' reasonable suspicion dissipated. Plaintiffs' Supp. at 5. But the entire detention was tied to the officers' suspicion that the vehicle was stolen, and "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354.

    That is not to say that the time it takes to investigate the traffic violation is irrelevant. "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is appropriate for a court to consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Plaintiffs argue the officers had or should have had information showing that the vehicle was not stolen as early as 1:36 p.m. Joint Brief at 43. But when Sergeant Pelayo approached Balsaver to explain what happened at 1:57 p.m., she stated that the officers were still waiting for the VIPU to confirm whether the vehicle was in fact stolen or had since been recovered. Although it is not clear when precisely the officers confirmed the vehicle was not stolen, Balsaver and Sen were uncuffed four minutes later, at 2:01 p.m. A delay of, at most, four minutes

while Sergeant Pelayo explained the situation to Plaintiffs was not unreasonable under the circumstances. *See Sharpe*, 470 U.S. at 686 (noting that a court should not "indulge in unrealistic second-guessing" of the officers' actions in handling an investigation).

In short, the officers responded with reasonable diligence after they stopped the vehicle. Further, even if the detention was prolonged as Plaintiffs assert (which assumes reasonable suspicion for the initial stop), the officers would be entitled to qualified immunity because Plaintiffs cite no case with sufficiently similar facts that would have put the officers on notice that such a brief investigatory delay was unreasonable.

### 2.    Unreasonable Search

Defendants also move for summary judgment on Balsaver's unreasonable search claim for Officer Jarvis's brief safety sweep of the back of the U-Haul. The search is the fruit of an unlawful stop if the officers did not have reasonable suspicion to conduct the stop in the first place. *See Sialoi*, 823 F.3d at 1237; *cf. United States v. Jaquez*, 421 F.3d 338, 342 (5th Cir. 2005) (noting that even "consent does not validate a search that is the product of an unlawful stop"). Even Defendants concede that the search, however brief, cannot be lawful without reasonable suspicion. Joint Brief at 25 ("As reasonable suspicion existed to detain Plaintiffs, the approximately 15-second sweep . . . did not violate Balsaver's constitutional rights."). However, only Officer Jarvis participated in the search of Balsaver's vehicle; none of the other individual Defendants participated in the search. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (noting in the pleading context that a constitutional violation must be alleged as to "each Government-official defendant, through his own individual actions"). Accordingly, while Officer Jarvis is not entitled to summary judgment, Sergeants Cooper and Pelayo and Officers Jianu and Choi are entitled to summary judgment on Balsaver's unreasonable search claim.

### 3.    Excessive Force

Defendants also move for summary judgment on Plaintiffs' excessive force claim, which is based on three allegations of excessive force: (1) Sergeant Cooper using overly tight handcuffing on Sen, (2) Officer Jianu placing his knee on the back of Balsaver's neck, and (3) Officers Jarvis, Jianu, and Choi pointing firearms at Plaintiffs.

     a.    <u>Handcuffing of Sen</u>

Sen claims that she had marks on her wrists for two days as a result of the handcuffs Sergeant Cooper placed on her.  Officer Jarvis's BWC recording shows faint marks on Sen's wrists after he removed her handcuffs, but Sen never complained about her handcuffs being too tight.  Overly tight handcuffing can constitute excessive force, but it is not a per se constitutional violation.  *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000).  Whether the act of handcuffing amounts to the use of excessive force depends on the "fact-specific" circumstances.  *Id*.  Cases finding overly tight handcuffs to constitute excessive force involved allegations that the individual "was either in visible pain, complained of pain, alerted the officer to pre-existing injuries, sustained more severe injuries, was in handcuffs for a longer period of time, asked to have the handcuffs loosened or released, and/or alleged other forms of abusive conduct in conjunction with the tight handcuffing." *Shaw v. City of Redondo Beach*, No. CV 05-0481 SVW (FMOx), 2005 WL 6117549, at *8 (C.D. Cal. Aug. 23, 2005) (collecting cases).  In other words, the circumstances must suggest that the officer was—or should have been—on notice that the handcuffs were placed too tight but failed to take appropriate action. *Cf. MacLellan v. County of Alameda*, No. C-12-5795 MMC, 2014 WL 793444, at *5 (N.D. Cal. Feb. 26, 2014) (granting summary judgment because there was "no evidence to support an inference that any of the deputies had any reason to believe the handcuffs may have required any adjustment"); *Foley v. Graham*, No. 2:16-cv-01871-JAD-VCF, 2020 WL 4736457, at *3 (D. Nev. Aug. 14, 2020) (granting qualified immunity because the plaintiff alleged "that he was subjectively experiencing pain" but offered no facts that suggested the officer "knew or should have known" that the handcuffs were too tight).

There is no evidence in the record that Sergeant Cooper was aware that Sen's handcuffs were too tight, nor is there any evidence that would suggest he should have known.  Sen never complained that her handcuffs were too tight; the BWC footage does not suggest that Sergeant Cooper was particularly aggressive when placing the handcuffs on Sen; and the marks on Sen's wrists were only visible once the handcuffs were removed.  In these circumstances, Sergeant Cooper is entitled to qualified immunity because Sen has not "identified any Supreme Court case that addresses facts like the ones at issue here." *Rivas-Villegas*, 142 S. Ct. at 8.

b.    Knee on Balsaver's Neck

Balsaver claims that Officer Jianu placed his knee on her neck causing her to feel some painful pressure at the top of her neck. JAE II (Balsaver Dep.), at 70:24–71:16. Video footage does appear to show that Officer Jianu's knee was on Sen's neck for approximately ten seconds. Placing weight on a person's neck can constitute excessive force, but a court must also consider the amount of force used. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (noting that whether force is excessive considers "the type and amount of force inflicted"). While it is not clear from Balsaver's testimony or the video recordings how much weight Officer Jianu placed on Balsaver's neck, there is no evidence in the record that suggests it was an amount of force that caused or was capable of causing Balsaver injury.

Plaintiffs cite no Supreme Court or Ninth Circuit authority that clearly establishes that the type and amount of force used here was excessive under factually similar circumstances. Instead, Plaintiffs cite a Ninth Circuit case that addresses the use of this type of force in materially distinguishable circumstances—namely, when the amount of force applied was enough to cause serious injury. *See Drummond*, 343 F.3d at 1056–57 (noting that the alleged force was "severe" and "capable of causing death or serious injury" when two officers pressed "their weight" on an individual's neck "as he lay handcuffed on the ground and begged for air"). Plaintiffs also cite cases outside this circuit, which even if relevant, would be insufficient for similar reasons. *See McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (two officers "applied what could be viewed as significant weight to [the plaintiff's] shoulders and neck for a period of time, perhaps as much as four to five minutes" despite the plaintiff's complaints that they were hurting his neck); *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) (addressing the "hog-tying" technique of binding an individual's arms and legs together and noting that it can potentially cause asphyxiation); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (plaintiff was asphyxiated by a "combination of the Officers placing their weight upon [the plaintiff's] body by lying across his back and simultaneously pepper spraying him"); *Est. of Escobedo v. City of Redwood City*, No. C 03-3204-MJJ, 2005 WL 226158, at *3 (N.D. Cal. Jan. 28, 2005) (the individual, who died, had "multiple blunt force injuries" to his head and neck, including a "thyroid cartilage fracture"). As the law did not clearly establish the illegality of the type and amount of force that Officer Jianu used, he is entitled to qualified immunity.

c.   <u>Pointing Weapons at Plaintiffs</u>

Finally, Plaintiffs claim that Officers Jarvis, Jianu, and Choi (who was holding a less-than-lethal beanbag gun) used excessive force by pointing their weapons at them.  But the video recordings show that while the officers aimed their weapons in the direction of the U-Haul, they held them in the low-ready position, pointed at the ground.

At the hearing, Plaintiffs argued that the recordings do not clearly show that Officers Jarvis, Jianu, and Choi never pointed their weapons directly at Plaintiffs.  But the angle of the officers' weapons is clear:  they were aiming their weapons towards the source of the perceived danger (Plaintiffs or the vehicle) but pointed toward the ground.  Even if any of the officers' weapons at some point briefly hovered over a part of Plaintiffs' bodies while they were lying on the ground, this would not be sufficient to constitute excessive force.  In the Ninth Circuit, an officer's use of a gun constitutes excessive force when the weapon is aimed or pointed at a suspect.  *See Allen v. Washington*, No. C05-5502KLS, 2006 WL 7132918, at *23 (W.D. Wash. Oct. 24, 2006) (collecting cases and noting that "the deliberate pointing of a gun at the suspect" is particularly problematic (cleaned up)).  There is a level of force and purposefulness in those cases that is not present here.  *Compare Robinson v. Solano County*, 278 F.3d 1007, 1010 (9th Cir. 2002) (the officer pointed a gun at the suspect's head at "point blank range" and thrust the weapon closer when repeating his commands), *with* JAE Ex. W (Choi Dep.), at 108:12–109:11 (Officer Choi held his beanbag gun in the low-ready position but is not sure whether Balsaver's "body passed through the line of the sight" of his weapon).  Looking at the "intrusiveness of all aspects of the incident in the aggregate," Officers Jarvis, Jianu, and Choi did not use excessive force.  *Robinson*, 278 F.3d at 1014 (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995).

Further, the officers are also entitled to qualified immunity because the facts of this case contrast significantly with Ninth Circuit cases that have found that pointing a gun at a suspect constitutes excessive force.  *See, e.g., Thompson v. Rahr*, 885 F.3d 582, 585–86 (9th Cir. 2018) (plaintiff claimed that the officer "pointed his gun at Thompson's head, demanded Thompson surrender, and threatened to kill him if he did not"); *Espinosa v. City of San Francisco*, 598 F.3d 528, 533, 537–38 (9th Cir. 2010) (officers forcibly entered an individual's home, held him "at gunpoint," and shot and killed him when he failed to comply with instructions); *Tekle v. United States*, 511 F.3d 839, 846 (9th Cir. 2007) (twenty-three officers held their guns to the head of an eleven-year-old boy, "searched him,

handcuffed him, pulled him up from behind by the chain of the handcuffs, and sat him on the sidewalk, still handcuffed, with their guns pointed at him, for ten to fifteen minutes"). In this case, the officers followed procedure for a high-risk stop, which included drawing their weapons but keeping them pointed at the ground and not directly at Plaintiffs. And the officers ceased all use of their weapons as soon as Plaintiffs were handcuffed.

Accordingly, Officers Jianu, Jarvis, and Choi[4] are entitled to qualified immunity because the law did not clearly establish that drawing their weapons and holding them in the low-ready position during a high-risk stop would violate the Fourth Amendment.

### 4.    Failure to Intervene

Defendants move for summary judgment on Plaintiffs' failure to intervene claim. Officers may be held liable for failing to intervene if they had a "'realistic opportunity' to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000). But as the Ninth Circuit recently noted in an unpublished opinion, "[o]ur precedent does not clearly establish when an officer has a 'realistic opportunity to intercede.'" *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020).

Moreover, Plaintiffs summarily discuss this claim without specifically addressing each officer's alleged failure to intervene. *See, e.g.*, Joint Brief at 33 ("The body camera footage shows the Defendants in close proximity to each other such that a jury could find that each Officer Defendant had a realistic opportunity to intercede."). It is therefore not clear which officers Plaintiffs claim should have intervened with respect to an alleged violation; and Plaintiffs reasonably cannot fault every officer for failing to intervene in every alleged violation based solely on their proximity to the alleged incident, even if they were unaware of it. *See, e.g.*, discussion *supra* (overly tight handcuffing). In any event, Plaintiffs do not cite any case law clearly establishing on similar facts that the officers had a duty to intervene here. Accordingly, the officer Defendants are entitled to qualified immunity.

---

[4] Officer Choi used a beanbag firearm. At the hearing, Plaintiffs' counsel acknowledged that he was unaware of any case holding that an officer may be liable for excessive force by pointing such a weapon at a person.

**B.**   ***Monell* Liability**

Defendants also move for summary judgment on municipal liability for Plaintiffs' § 1983 claims, while Plaintiffs move for partial summary judgment on the issue of whether LAPD's policy of conducting high-risk stops on suspicion of a stolen vehicle was the "moving force" behind the alleged violations of Plaintiffs' constitutional rights.

A local government may be sued under § 1983 for an injury inflicted by its employees or agents "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  To establish *Monell* liability, Plaintiffs must show that Defendant City of Los Angeles "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation." *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007).  This includes "both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013).

    a.    High-Risk Stop

Plaintiffs seek to hold the City accountable for the officers' actions during the stop, arguing that they acted pursuant to LAPD policy.  It is beyond dispute that the officers conducted a high-risk stop pursuant to LAPD policy and procedure for a suspected stolen vehicle.  *See, e.g.*, JAF Ex. CC (Soulema Dep.), at 44:19–46:2, 88:22–89:23 (confirming that LAPD trains officers to conduct a high-risk stop upon suspicion of a stolen vehicle).  LAPD's procedure for high-risk stops includes ordering suspects into the prone position on the ground and handcuffing them, with back-up officers holding weapons in the "low-ready" position.  JAF 14–15.  It also includes a search of the vehicle.  JAF 358, JAE Ex. EEE (LAPD training for high-risk vehicle stops).  The video recordings capture the officers repeatedly explaining to Plaintiffs during the stop (and after, when Plaintiffs met with Sergeant Pelayo) that they were merely acting in accordance with their standard procedure for a suspected stolen vehicle.

Defendants argue that Plaintiffs cannot prove the existence of a policy based on a single incident.  Joint Brief at 21.[5]  But a pattern of constitutional violations is

---

[5] Defendants also argue that Plaintiffs will not be able to demonstrate that LAPD's policy of conducting high-risk stops is unconstitutional.  But the Ninth Circuit has held that in certain circumstances, use of particularly intrusive methods during a

only necessary "[a]bsent a formal governmental policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Theney*, 2017 WL 10743001, at *11 (finding that LAPD's policy for high-risk stops is "officially documented and supported by officer testimony," thus "there is no need to demonstrate multiple occurrences"); *Chinaryan v. City of Los Angeles*, No. 2:19-cv-09302 MCS (Ex), 2021 WL 4535349, at *10 (C.D. Cal. Jan. 25, 2021) (finding that LAPD's policy was the "moving force" behind the officers' actions and granting the plaintiffs' motion for summary judgment).  The record contains undisputed evidence that this is LAPD's formal policy, including official documentation and testimony from multiple officers and the City's 30(b)(6) witness.

    Accordingly, the Court finds that LAPD's high-risk stop policy and procedure was the "moving force" behind the officers' actions with respect to Plaintiffs' unreasonable search and seizure claims.  However, the City is entitled to summary judgment on municipal liability for Plaintiffs' excessive force and failure to intervene claims.  The record contains no evidence of any municipal policy or practice sanctioning overly tight handcuffing, placing a knee on a suspect's neck, or pointing a weapon directly at a suspect during a high-risk stop.  Indeed, LAPD policy is that an officer should not place his knee on the back of a suspect's neck and that weapons are to be held in the low-ready position.  Soulema Dep. at 109:19–109:22.[6]  Further, there is no record evidence of any City policy or practice that police officers should not intervene if they see another officer engaging in unconstitutional conduct.  In short, these claims seek to hold the city liable solely based on the allegedly unconstitutional actions of individual officers not pursuant to any official policy.  This is not a permissible theory of municipal liability.  *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

---

stop may amount to a de facto arrest.  *Green*, 751 F.3d at 1047.  As neither party moves for summary judgment on whether the high-risk tactics used here amounted to a de facto arrest, however, the Court does not address this issue.

[6] The day of the hearing, Plaintiffs submitted an updated version of Soulema's deposition, Dkt. Nos. 119, 120, noting that he admitted that the muzzle of an officer's gun could be covering some portion of a suspect's lower body in the low-ready position.  Soulema Dep. at 112:9–113:4.  This admission does not alter the Court's conclusion that the officers' use of their weapons in this case is not sufficient to constitute excessive force.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (no municipal liability in the absence of an underlying constitutional violation).

b.    Failure to Train

Defendants also argue that Plaintiffs' cannot succeed on their theory that the City failed to train officers on the meaning of the "CV" code because they cannot establish the requisite intent.  Joint Brief at 21.

To establish a failure to train claim, Plaintiffs must show:  (1) they were deprived of a constitutional right, (2) the City's training policy "amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact"; and (3) their injury "would have been avoided had the City properly trained those officers."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (cleaned up).  Plaintiffs may demonstrate deliberate indifference either by showing that the City was on actual or constructive notice of the omission in officer training or that it was "so 'obvious' that ignoring it amounted to deliberate indifference."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012).

Plaintiffs argue that this single incident is sufficient to demonstrate the type of failure to train that is "patently obvious."  Joint Brief at 23–24.  Evidence of a pattern of constitutional violations is typically required, but "'in a narrow range of circumstances' a particular 'showing of obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal culpability.'"  *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (cleaned up).  For example, the Supreme Court has noted that the use of firearms may satisfy deliberate indifference based on a single incident:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

There is a similarly obvious need for proper training here.  This is not the first time a stolen vehicle has been recovered by police; indeed, it happens often enough that there is a designated code for this crucial information.  If officers are

not trained on the meaning of this code, performing a mistaken stop of a vehicle is a "patently foreseeable consequence" of this failure to train.  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008).

It is undisputed that if the officers had known what the "CV" code meant, Plaintiffs' vehicle would not have been stopped.  JAF 385.  While there may have been additional steps the officers could have taken to avoid initiating the stop (e.g., inquiring about the meaning of the unknown code), the City has not demonstrated that its alleged failure to train did not cause the unlawful stop as a matter of law.  According to Sergeant Pelayo, the "immediate fix would be to inform all officers about the code."  JAF 384.  The City has not cited any authority to suggest that it cannot be held liable in these circumstances (i.e., when there are multiple "but for" causes for separate negligent acts).  Accordingly, the City is not entitled to summary judgment on Plaintiffs' failure to train theory.

## C.    **Bane Act Claim**

Defendants move for summary judgment on Plaintiffs' Bane Act claim.  Cal. Civ. Code § 52.1.  In addition to a constitutional violation, § 52.1 "requires a 'a specific intent to violate" an individual's constitutional rights.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).  Defendants' concede that this incident occurred as a result of the officers' negligence.  But there is no evidence that any of the officers had a specific intent to violate Plaintiffs' constitutional rights, nor any evidence that they acted with even a reckless disregard for Plaintiffs' rights.  On this record, Plaintiffs have not demonstrated that there is a triable issue of fact with respect to whether the officers had the requisite intent to be held liable under the Bane Act.  Accordingly, Defendants are entitled to summary judgment.

## D.    **Negligence Claim**

Finally, Plaintiffs move for summary judgment on their negligence claim as to Defendant City of Los Angeles on the grounds that the City's violation of California Penal Code § 11077.2(c) constitutes negligence per se.

Under California Government Code § 815.6, a plaintiff can establish a presumption of negligence against a public entity if it is "under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury."  Under those circumstances, "the public entity is liable for an

injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." *Id*.

Plaintiffs cannot establish a presumption of negligence under § 11077.2(c). This statute provides that users of the California Department of Justice's (Cal DOJ) communication network (the California Law Enforcement Telecommunications System, or CLETS) must comply "with any policy, practice, procedure, or requirement deemed necessary by the department to maintain network security and stability." Cal. Penal Code § 11077.2(c). LAPD officers access CLETS data—including the SVS database that produced the MDC return on Plaintiffs' vehicle—through their MDCs. JAF 206. Plaintiffs argue that that the City violated Cal DOJ policy by failing to obtain preapproval to upgrade its CLETS operating system, which would have included testing the upgraded system for any bugs. JAF 224. Plaintiffs argue that Defendants might claim the high-risk stop was initiated based on an erroneous MDC return, and any errors or glitches would have been discovered during preapproval testing. Joint Brief at 47. But no one has claimed that the MDC return was the result of a system error. JAF 238.[7] Furthermore, this alleged statutory violation cannot establish a presumption of negligence for the police action Plaintiffs experienced. The statute is plainly aimed at protecting the security and stability of Cal DOJ's communication network. Plaintiffs have not shown that their injury is the "particular kind of injury" that the statute is designed to protect against. Cal. Gov't Code § 815.6. Accordingly, they are not entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court rules as follows with respect to the parties' motions for summary judgment:

---

[7] The officers initially thought this type of message was an error, but there is no evidence in the record to suggest that was actually the case. Thus, Plaintiffs ask the Court to grant them summary judgment to foreclose a potential argument at trial. Plaintiffs' Supp. at 10 (noting that Defendants "refused to stipulate not to present this argument at trial"). This is not sufficient to create a genuine issue of material fact. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Defendants' Motion

1.   Summary judgment on Plaintiffs' unreasonable seizure claim is **GRANTED** as to Chris Choi, William Cooper, Jeannette Pelayo, and Michael Moore, but **DENIED** as to John Jianu and Jonathon Jarvis;

2.   Summary judgment on Plaintiffs' unreasonable search claim is **GRANTED** as to Officer Choi, Sergeant Cooper, Officer Jianu, Sergeant Pelayo, and Chief Moore, but **DENIED** as to Officer Jarvis;

3.   Summary judgment on Plaintiffs' excessive force claim is **GRANTED** as to Officer Choi, Sergeant Cooper, Officer Jarvis, Officer Jianu, Sergeant Pelayo, and Chief Moore;

4.   Summary judgment on Plaintiffs' failure to intervene claim is **GRANTED** as to Officer Choi, Sergeant Cooper, Officer Jarvis, Officer Jianu, Sergeant Pelayo, and Chief Moore;

5.   Summary judgment on Plaintiffs' *Monell* claim against the City of Los Angeles is **GRANTED** as to Plaintiffs' excessive force and failure to intervene claims, but **DENIED** as to Plaintiffs' unreasonable search and seizure claims and Plaintiffs' failure to train theory; and

6.   Summary judgment on Plaintiffs' Bane Act claim is **GRANTED** as to all Defendants.


Plaintiffs' Motion

1.   Summary judgment on Plaintiffs' unreasonable seizure claim for prolonged detention is **DENIED**;

2.   Partial summary judgment on Plaintiffs' *Monell* claim is **GRANTED**; and

3.   Summary judgment on Plaintiffs' negligence claim is **DENIED**.